IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| DR. MARSHALL BURNS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACT. NO. 3:19-cv-509-ECM |
| | ) | (WO) |
| TUSKEEGEE UNIVERSITY, *and* | ) | |
| DR. LILY MCNAIR, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION and ORDER**

**I.   INTRODUCTION**

Dr. Marshall Burns ("Plaintiff") seeks compensatory damages and injunctive relief pursuant to the Age Discrimination in Employment Act of 1967 ("ADEA"), Title VII of the Civil Rights Act of 1964 ("Title VII"), and 42 U.S.C. § 1981 against Defendant Tuskegee University ("Defendant") and Lily McNair.[1]   The Plaintiff alleges the Defendant discriminated against him on the bases of his age, race, and nation of origin when setting his pay.   Currently pending before the Court is the Defendant's motion for summary

---

[1] The Plaintiff brings his ADEA claim against both Tuskegee and President Lily McNair and her predecessors in office. (Doc. 1 at 5).  He clarifies that his claim is against McNair "only in her capacity as President of Tuskegee and is being brought only in her official capacity under the ADEA for injunctive relief purposes pursuant to *Ex parte Young*." (*Id*. at 2).   Because *Young* provides an exception to the Eleventh Amendment's prohibition of suits against state officials in their official capacity, his claim for injunctive relief fails because, as the Plaintiff recognizes, Tuskegee is not a public entity, but "is instead a private sector entity."  (*Id*. at 2); *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999) (discussing *Ex parte Young*, 209 U.S. 123 (1908)).   Additionally, any individual suit against McNair also fails because claims against individual defendants are not cognizable under the ADEA. *Mason v. Stallings*, 82 F.3d 1007, 1009 (11th Cir. 1996).  Therefore, because no claims can proceed against McNair, the Court dismisses her from this lawsuit.

judgment.[2] (Doc. 32).  After carefully reviewing the Defendant's motion for summary judgment, the Plaintiff's response to the motion and the evidentiary materials, the Court concludes that the motion is due to be GRANTED.

## II.    JURISDICTION

The Court exercises subject matter jurisdiction over this dispute pursuant to 28 U.S.C. §§ 1331.  Personal jurisdiction and venue are uncontested.

## III.  LEGAL STANDARD

"Summary judgment is proper if the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1311 (11th Cir. 2018) (quoting FED.R.CIV.P. 56(a)).  "[A] court generally must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment."  *Fla. Int'l Univ. Bd. of Trs. v. Fla. Nat'l Univ., Inc.*, 830 F.3d 1242, 1252 (11th Cir. 2016).  However, "conclusory allegations without specific supporting facts have no probative value."  *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924–25 (11th Cir. 2018).  If the record, taken as a whole, "could not lead a rational trier of fact to find for the non-moving party," then there is no genuine dispute as to any material fact. *Hornsby-Culpepper*, 906 F.3d at 1311 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

---

[2] Also pending before the Court are the Defendant's motions to strike Plaintiff's expert witness report, (doc. 25), and *Daubert* motion, (doc. 35), and the Plaintiff's motion to supplement the Plaintiff's response in opposition to strike expert, (doc. 36).  On December 9, 2020, the Plaintiff filed notice of withdrawal of Expert witness.  Therefore, the above motions will be denied as moot.

The movant bears the initial burden of demonstrating that there is no genuine dispute as to any material fact, and the movant must identify the portions of the record which support this proposition. *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The movant may carry this burden "by demonstrating that the nonmoving party has failed to present sufficient evidence to support an essential element of the case." *Id.* The burden then shifts to the non-moving party to establish, by going beyond the pleadings, that a genuine issue of material fact exists. *Id.* at 1311–12.

## IV. FACTS

Dr. Marshall Burns is a seventy-four-year-old white man who was born in the United States. (Doc. 33 at 8). He received his Ph.D. from Kent State University in 1972. (*Id.*). And he began teaching at Tuskegee University in 1976 as an assistant professor of physics. (Doc. 41 at 1). In 1978, Tuskegee awarded the Plaintiff tenure and promoted him to associate professor, and two years later, the University made the Plaintiff full professor. (*Id.* at 1–2).

The Plaintiff worked as a professor at Tuskegee for over forty years until his resignation in 2020. In 1984, the Plaintiff published two articles in the International Journal of Biomechanics after applying for and being granted sabbatical leave for the 1982-1983 year. (Doc. 33 at 18). The Plaintiff published a textbook in 1988. (*Id.*). In 2012, his textbook was recorded "page by page" for video. (*Id*. at 19).

In 1979, the Plaintiff received a one-time grant from the Air Force Office of Research to conduct work at Wright-Patterson Airforce base. (*Id.*). In the early 1980s, the Plaintiff participated in a grant proposal valued at over $1,000,000 along with several other

faculty members.  This grant proposal was never funded. (*Id.*).  The Plaintiff estimates he served on at least "half a dozen" grant proposals, either alone or with other faculty, while at Tuskegee. (*Id.* at 20).

During his time at Tuskegee, the Plaintiff participated on several academic committees and performed other administrative activities.  In the 2002–2003 year, the Plaintiff served on the Educational Policies Committee, the Academic Honesty Committee, and the Faculty Industry Task Force Committee. (*Id.*).  From 2016–2018, the Plaintiff served on the Academic Honesty Committee.  The Plaintiff has not chaired an academic committee in ten years.  The Plaintiff has not attended a faculty retreat. (*Id.* at 17–18).  He has not advised students in the last ten years. (Doc. 42 at 3).  Members of his department supported his appointment as chair of the Physics Department, but he declined the opportunity. (*Id.*).

At the time he left Tuskegee, the Plaintiff was one of seven members of the physics faculty and was one of only two full professors.  He was also the only white American-born professor in the department. (Doc. 33 at 26).  Not including summer and overload pay, the Plaintiff had the third highest salary in the department. (*Id.* at 25).

Tuskegee sets faculty merit pay, promotions, and tenure based on criteria set forth in the Faculty Handbook. (Doc. 33 at 12).  There are four general criteria: teaching, research, scholarship, and service.  "Teaching" includes factors such as number of classes taught, graduate student supervision, and student and faculty evaluations. (*Id.*).  "Research" encompasses "procurement of grants," and the handbook "urges faculty members to submit proposals for funded research as well as to conduct research whether or not funded." (*Id.*).

4

"Scholarship" requires that "faculty maintain and establish a continuing record of professional development through publications." (*Id*. at 13).  Faculty are also required to serve the University through "active participation on committees, councils, and similar groups . . . ." (*Id*.).  Merit raises are performance based and are not guaranteed. (*Id*.).

Tuskegee faculty have several opportunities to augment their pay.  They can either teach additional classes during the semester or teach during the summer.  The Plaintiff regularly taught in the summers during his career, but he has not taught summer classes since 2004. (*Id.* at 15).

During his career at Tuskegee, the Plaintiff made repeated verbal and written requests that his salary be increased. (*Id.* at 24).  The Plaintiff testified that he received only small raises during his tenure at Tuskegee and only a five-hundred dollar increase during his last nine years at the university. (Doc. 41 at 7).  Tuskegee has records of six of the Plaintiff's requests for increases in pay starting in 1980. (Doc. 33 at 24).  In 2006, the Plaintiff sent letters to the Tuskegee provost saying that he and his colleagues Dr. Kothari and Dr. Sharma were undercompensated compared to professors in other departments. (Doc. 41 at 8).  In 2007, again on behalf of himself and Dr. Sharma, the Plaintiff sent another letter explaining that they were underpaid and this underpayment "stems from neither of us receiving a salary increase when we were promoted" to professor. (Doc. 33 at 24).  In 2018, the Plaintiff sent the University a letter stating that he would not sue if Tuskegee addressed his "salary discrimination." (Doc. 41-8).  This was followed by another letter a month later explaining that the Plaintiff would take the rest of the semester off with the sick leave he had accrued over his forty-two years teaching. (Doc. 41-9).

The Plaintiff filed an EEOC charge against Tuskegee University on November 5, 2018.  In his charge, the Plaintiff checked the boxes for discrimination based on race, color, age, and nation of origin. (Doc. 41-2).   Specifically, he alleged that the University underpaid him because he was in his seventies, white, and born in the United States.  On July 19, 2019, he sued Tuskegee University alleging race, nation of origin, and age discrimination. (Doc. 1).

The Plaintiff remained at Tuskegee University until August 2020.  When asked to return to the classroom for the 2020 fall semester, the Plaintiff explained that he could not continue his teaching in person because of the COVID-19 pandemic. (Doc. 33 at 9–10). The University offered the Plaintiff the opportunity to work remotely if he provided medical documentation.  The Plaintiff declined to comply with this request, and shortly thereafter, he resigned[3] from the faculty. (*Id.* at 11).

## V. DISCUSSION

Under the ADEA, Title VII, and § 1981, the Plaintiff alleges that Tuskegee discriminated against him because of his age, race, and nation of origin.   To prove discrimination, the Plaintiff may use direct evidence ("evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption") or circumstantial evidence. *Morris v. Emory Clinic, Inc.*, 402 F.3d 1076, 1081 (11th Cir. 2005).  Because the Plaintiff

---

[3] On December 10, 2020, the Plaintiff sent a letter to Tuskegee stating, "I wish to clarify my retirement was in the nature of constructive discharge." (Doc. 41-20).  However, because the Plaintiff never alleged constructive discharge or amended his complaint to do so, the Plaintiff failed to properly plead this claim. Therefore, constructive discharge is not a claim before the Court.

points to no direct evidence of discrimination, the Plaintiff must produce circumstantial evidence to show that Tuskegee discriminated against him.

Discrimination claims based on circumstantial evidence under the ADEA, Title VII, or § 1981 are to be evaluated under the *McDonnell Douglas* burden shifting framework. *See Sims v. MVM, Inc*., 704 F.3d 1327, 1332 (11th Cir. 2013) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To satisfy the initial burden under this framework, the plaintiff must demonstrate a *prima facie* case of discrimination. (*Id*.). This requires a showing that (1) the plaintiff was a member of a protected class; (2) he was subject to an adverse employment action; (3) a person outside the protected class was treated more favorably under similar conditions; and (4) the plaintiff was qualified. *Liebman v. Metro. Life Ins. Co.,* 808 F.3d 1294, 1298 (11th Cir. 2015); *Emory Clinic*, 402 F.3d at 1081. Establishing the *prima facie* case creates a presumption that the employer unlawfully discriminated against the employee and "a required conclusion [of discrimination] in the absence of an explanation." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981).

Once the plaintiff has established a *prima facie* case, the burden then shifts to the defendant to produce a legitimate nondiscriminatory reason for the employment action. *St. Mary's Honor Ctr.*, 509 U.S. at 507. This is a burden of production, not persuasion. So upon producing evidence of a legitimate nondiscriminatory reason, the presumption in favor of the plaintiff is rebutted and falls away. *Burdine*, 450 U.S. at 255 (1981).

After the defendant provides a legitimate nondiscriminatory reason, the burden then shifts back to the Plaintiff to show that the defendant's explanation is pretextual. *Sims*, 704

F.3d at 1332.   A plaintiff can show pretext by "directly persuading the court that a discriminatory reason more likely motivated the employer" or indirectly that the employer's explanation is not believable. *Burdine*, 450 U.S. at 256 (1981).   At all times, the ultimate burden of persuasion remains with the plaintiff to show the defendant intentionally discriminated against the plaintiff. *St. Mary's Honor Ctr.*, 509 U.S. at 507.

Because the Plaintiff alleges age, race, and nation of origin discrimination, the Court will consider his claims under the respective statutory schemes.   First, it will consider whether the Plaintiff sustains his evidentiary burden for the ADEA claim under the *McDonnel Douglas* burden shifting analysis.   The Court will next consider his race and nation of origin claim.   Because the same analytical framework applies for both the Plaintiff's Title VII and § 1981 claims, the Court will evaluate them together under the *McDonnel Douglas* framework.

But before embarking on the merits of the Plaintiff's claims, the Court must first determine the admissibility of several of the Plaintiff's evidentiary submissions.

## A. Preliminary Evidentiary Issues

In opposition to the Defendant's motion for summary judgment, the Plaintiff submitted his own declaration and a 2016 EEOC charge filed against Tuskegee by Vinaida Robnett.  In his declaration, the Plaintiff contests many facts presented by the Defendant—many of the same facts that were taken directly from the Plaintiff's deposition testimony. (Doc. 41-3).   The Plaintiff argues that the EEOC charge filed by Ms. Robnett, an employee of the Department of Veterinary Medicine, demonstrates a university-wide pattern and practice of age and nation of origin discrimination.   (Doc. 41-16).   The Defendant argues

that both submissions are improper and should not be considered by the Court. Specifically, the Defendant argues that the EEOC charge is inappropriate "me too" evidence, and that the Plaintiff's declaration is an inadmissible "sham" affidavit. (Doc. 42 at 5 – 8, 15–16).   Because the Plaintiff refers to both documents throughout his brief in opposition to summary judgment, the Court must determine their admissibility before deciding whether summary judgment is warranted.  The Court will consider each document in turn to determine if they will be considered as evidence.

### 1. *Plaintiff's declaration and affidavit*

The Defendant argues that the Plaintiff's declaration is a sham affidavit because most of the statements are conclusory or in direct conflict with his earlier deposition testimony. (*Id*. at 6).   The Plaintiff argues, in reply, that the Plaintiff's self-serving statements are admissible to defeat summary judgment because sworn testimony based on first-hand knowledge is admissible. (Doc 43-1 at 2).[4] The Plaintiff argues that this is enough to overcome the Defendant's allegation that the affidavit is a sham.

The Eleventh Circuit teaches that a party cannot create a genuine issue of material fact with an affidavit that simply contradicts past testimony. *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.,* 736 F.2d 656, 657 (11th Cir. 1984). The Circuit clarified that a court "may *only* disregard an affidavit that contradicts, *without explanation*, previously given clear testimony" in response to unambiguous questions. *Lane v. Celotex Corp.,* 782 F.2d

---

[4] The Plaintiff sought leave to submit a sur-reply brief, (doc. 43), which was granted by the Court.  Even though the Plaintiff never separately filed the sur-reply, which he had attached to his motion, the Court considered it.

1526, 1532 (11th Cir.1986) (emphasis in original).  The Court recognizes that it would be inappropriate to disregard an affidavit as a sham based on "every failure of memory or variation in a witness's testimony." *Tippens v. Celotex Corp.,* 805 F.2d 949, 953 (11th Cir. 1986).  So the sham affidavit rule should be applied "sparingly because of the harsh effects [it] may have on a party's case." *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1316 (11th Cir. 2007).  Therefore, a court should only disregard an affidavit as a sham when there is a direct inconsistency between the testimony offered in an affidavit and that which took place in the party's deposition, *Tippens,* 805 F.2d at 953–54, and there is no explanation for the contradiction. *Allen*, 495 F.3d at 1316.

Here, the Plaintiff attempts to do two things with his affidavit.  First, he uses it to highlight his own accomplishments as compared to those of his colleagues in the department.  Second, he offers a response to the Defendant's "Statement of Undisputed Facts."

The Plaintiff compares his accomplishments to those of others in his department. However, many of the Plaintiff's claims are either conclusory, (doc. 41-3 at 2) ("I am certain I have done the most to build up the Physics Department . . ."), or they are statements of non-material facts. (*Id.*) ("I personally recruited 8-12 students a year for the physics major.").  Notably, in two places, the Plaintiff characterizes his contributions in a markedly different way than he did at his deposition.  In response to the Defendant's description of the Plaintiff's participation in an interdisciplinary grant proposal in the early 1980s that was never funded, the Plaintiff  states, "I did so much [to secure money] (over $1 million) for Tuskegee." (Doc. 41-3 at 8).  The Plaintiff provides no additional evidence

10

of his participation in other grant proposals over $1,000,000.  And when asked in his deposition if there were any grant proposals other than one received in the early 1980s for $10,000, the Plaintiff said, "No. I don't remember any others." (Doc. 34-1 at 15). Similarly, in response to the Defendant's evidence that Professor Sharma authored seven articles and five conference papers, the Plaintiff asserts in his affidavit, "I have also done 6-7 articles and have spoken at many conferences with about 12 papers presented." (Doc. 41-3 at 13). The Plaintiff again does not provide any evidence of his publications or presentations. They are not identified on his faculty page or past submissions to the University of his academic activities. (Doc. 34-2 at 97).  In his deposition when asked what he had published, he referenced the articles he published while on sabbatical in the early 1980s and noted that "he published [basic research] until '84 or '85." (Doc. 34-1 at 31).  The Plaintiff provides no explanation for this inconsistent testimony, so it will not be considered by the Court.

In responding to Defendant's recitation of undisputed facts, many of the Plaintiff's responses are either conclusory or non-material.  However, some of the Plaintiff's affidavit testimony does touch on material facts about his pay, specifically about summer employment.

To support the claim that his ten-month pay should be compared to his colleagues' total pay, including summer compensation, the Plaintiff, for the first time, suggests in his affidavit that he was excluded from teaching in the summer. The Plaintiff states, "my requests for summer work went unheeded . . . ," and "I did not get the same summer teaching opportunities which my younger and different national [sic] origin faculty

11

members got.  Even though I frequently requested them from the Administration, they were not offered to me." (Doc. 41-3 at 5–6).  These statements conflict with the Plaintiff's deposition testimony.  At his deposition, the Plaintiff testified that he did not typically teach summers while at Tuskegee.  (Doc. 34-1 at 16).  When asked whether that was his "own election," the Plaintiff answered, "yes." (*Id.*).  Regarding the summers he did teach, he was asked whether he requested to teach, or the University asked him.  The Plaintiff answered, "both." (*Id.*).  When asked, "[w]as there ever a time that you wanted to teach in the summer that they wouldn't let you?" the Plaintiff answered, "no." (*Id.*).  The Plaintiff's affidavit testimony squarely contradicts his deposition testimony.  The only explanation the Plaintiff provides is that he "maybe misunderstood the question." (Doc. 41-3 at 6).  Considering the fact that the Plaintiff was cautioned by defense counsel at his deposition that if he answered a question it would be assumed that he understood it and the question itself was unambiguous, Plaintiff's late-made claim that he misunderstood the question falls short.

The Plaintiff further argues in his Sur-Reply that the Defendant misses the important nuance that there is a difference between never being denied the opportunity to teach and affirmatively being offered the opportunity. (Doc. 43-1 at 4–5).  This argument, not only strained, is inconsistent with both the Plaintiff's deposition and affidavit testimony.  At his deposition, he testified that it was his own election not to teach during the summer.  And he also answered "both" when asked whether he would request, or the University would offer, the opportunity to teach over the summer.  The attempted distinction between denying a request and affirmatively offering summer teaching is inconsistent with the Plaintiff's affidavit testimony where the Plaintiff repeatedly states, in direct contradiction

12

to his deposition testimony, that his requests to teach over the summer were ignored. Because the Plaintiff does not explain the inconsistencies between his deposition and the affidavit, the Court will disregard the sections of his affidavit wherein he testifies that his requests to teach during the summer were denied.

### 2. "*Me too*" evidence

The Plaintiff offers as evidence an EEOC charge and appended affidavit of Vinaida Robnett, who, in September 2016, filed a charge against Tuskegee alleging age, nation of origin, and sex discrimination. (Doc. 41-16). The Plaintiff argues this evidence shows that preferences for younger and foreign employees existed in other departments. (Doc. 41 at 11).

The Eleventh Circuit has recognized certain circumstances where examples of discrimination against other employees can serve as evidence of discrimination. *Goldsmith v. Bagby Elevator Co., Inc.,* 513 F.3d 1261, 1285–86 (11th Cir. 2008). This "me too" evidence is typically allowed when "it involves employment decisions by the same person who made decisions affecting the plaintiff," and the other employee held a position similar to the plaintiff and suffered an adverse employment action similar to the plaintiff. *Ray v. Lee Brass Foundry, LLC*, 2017 WL 2671024, at *21 (N.D. Ala. June 21, 2017) (citing *Goldsmith*, 513 F. 3d at 1286).

Here, the "me too" evidence lacks any commonality with the alleged discriminatory treatment experienced by the Plaintiff. Ms. Robnett was not a member of the Tuskegee Physics Department, nor was she a professor. (Doc. 41-16 at 2). Her adverse employment action was losing her job because of a reduction of force—she did not claim that she was

paid less because of a protected characteristic. (*Id.*).  The Plaintiff also filed his EEOC charge two years after Robnett filed hers.  And there is no evidence that the reduction in force and the Plaintiff's pay decisions were made by the same person.  Therefore, the proffered "me too" evidence does not involve the same employment decision made by the same person at Tuskegee, the Plaintiff and Robnett did not hold similar positions, and they do not allege to have experienced the same type of adverse employment decision. The "me too" evidence is not probative as to the Plaintiff's claims against Tuskegee, and this Court will afford it little to no weight.

### B.  The Plaintiff's ADEA claim

The Plaintiff alleges that Tuskegee paid him less than his younger Physics Department colleagues because of his age.  To support his claim for age discrimination, the Plaintiff argues that three of his colleagues, aged forty-seven, forty-one, and forty-two, were more highly-compensated because of their age. (Doc. 41 at 4).  He also argues that it was discriminatory for the University to deny his request for leave to finish a textbook. (Doc. 1 at 4–5).  The Plaintiff points to the omission of the word "age" in a list of protected characteristics in the Faculty Handbook as evidence of "a lack of sensitivity about" age and to "discourage" faculty from complaining. (Doc. 41 at 10–11).

Pursuant to the ADEA, "it is unlawful for an employer . . . to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). ADEA protection extends only to those who are at least forty years of age. 29 U.S.C.A. § 631(a).  The Supreme Court has interpreted "because of" in the statute to mean that age

was the "reason" that the employer took the adverse action. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  Therefore, a plaintiff must show that age was the "but-for" cause of the employer's adverse action to prevail on an ADEA claim. *Id.* at 177.

Here, the Plaintiff acknowledges that his ADEA claim is based on circumstantial evidence. (*Id.* at 43–44). Therefore, the Court will use the *McDonnel Douglas* burden shifting framework to determine whether the Plaintiff has met his evidentiary burden. *See Liebman,* 808 F.3d at 1298.

### 1. *The Plaintiff sets forth a* **prima facie** *case for age discrimination.*

The Plaintiff argues, and the Defendant concedes, that the Plaintiff establishes a *prima facie* case of age discrimination. (Doc. 33 at 40).  At seventy-four years old, the Plaintiff is a member of the protected group—those over the age of forty. *See* 29 U.S.C. §§ 623(a)(1) & 631(a).  The University denied his requests for leave and salary adjustments. Considering the Plaintiff has a PhD in physics and has taught at Tuskegee for over forty years, he has established that he was qualified for his job as a professor of physics.  Finally, younger professors in his department made more money than he did. (Doc. 41 at 3–4; 44–45).

Although all the members of the Physics Department are over forty years old, the appropriate ADEA inquiry is whether the proposed comparator is substantially younger— not that he or she is under forty.  *Liebman,* 808 F.3d at 1298.  The Supreme Court has explained, "[t]he fact that one person in the protected class has lost out to another person in the protected class is ... irrelevant, so long as he has lost out *because of his age.*" *Id.* at 1299 (emphasis in original).  Although the Plaintiff and Defendant do not agree which

employees are the proper comparators, this determination is not required at the *prima facie* stage.  Because the Plaintiff has shown that substantially younger colleagues were paid more, the Plaintiff satisfied his burden.  The Plaintiff has made out a *prima facie* case of discrimination, so the burden of production now shifts to the Defendant.

## 2. *The Defendant has produced a legitimate nondiscriminatory reason for the Plaintiff's pay.*

To satisfy its burden of production, the Defendant must produce a legitimate nondiscriminatory reason for the employment action. *St. Mary's Honor Ctr.*, 509 U.S. at 506.  Tuskegee sets faculty pay based on the same factors which govern tenure and promotion (teaching, research/grant proposals, scholarship, and service).  Although the Plaintiff met expectations for teaching, the University argues the Plaintiff was deficient in research/grant proposals, scholarship, and service to the University.  As support, Tuskegee points to how other members of the physics faculty fulfilled the University's merit-based pay factors.

Although the Defendant and Plaintiff disagree on comparators, the Defendant nevertheless shows all potential comparators' contributions were more substantial than the Plaintiff's.

The Defendant argues that the most appropriate comparator to the Plaintiff is Professor Prakash Sharma.  The Plaintiff and Professor Sharma are the only full professors in the department; Dr. Sharma is seventy-one years old; both he and the Plaintiff joined Tuskegee in the 1970s; and the Plaintiff alleges that neither of them received raises when they were made full professor. (Doc. 33 at 40).  This is where the similarities between the

two end.   Tuskegee presented evidence that Dr. Sharma excelled in research, grant proposals, scholarship, and service.  He was the head of the Physics Department for over 16 years; he has published extensively; he has multiple funded grants; and he has demonstrated extensive service to the community, including being a fellow of the Alabama Academy of Arts and Sciences. (*Id*. at 41).  The Plaintiff concedes that Dr. Sharma "was very active in getting grants in.  So he'd get two, three percent raises year after year." (*Id.* at 41).  For the 2019 school year, Dr. Sharma's base ten-month salary was $77,346.  He supplemented his salary by teaching overload and summer school, bringing his 2019 annual pay to $96,013.26. (*Id*. at 26).

The Defendant also offers similar legitimate nondiscriminatory reasons for pay decisions for the Plaintiff's proposed comparators—Dr. Akshaya Kumar, Dr. Chitra Nayak, and Dr. Moses Ntam.

- Dr. Akshaya Kumar is forty-seven years old and was born in India. (*Id*.).  He is an associate professor of physics.  Since August 2019, he has served as the interim department head. (*Id.* at 28).  While at Tuskegee, Dr. Kumar also served as a member and president of the Alabama Academy of Arts and Sciences, 2016–2017 chair of the grievance committee, judge of a student science competition, and a 2017 open house recruiter. (*Id*.).  He has also authored or coauthored seven articles and presented at five conferences. (*Id*.).  And as of 2017, he has one $120,000 funded grant and three pending grants valued at $292,892. (*Id*.).  Dr. Kumar's base ten-month pay in 2019 was $66,300.  He supplemented his base pay through summer teaching which brought his total compensation to $79,300. (*Id.* at 26).

17

- Recently promoted from assistant to associate professor, Dr. Chitra Nayak is forty-one years old and is from India. (*Id*).  While at Tuskegee, Dr. Nayak chaired the General Education Committee, was a member of the Kerala Tele Science Scholar Program, served as an academic advisor to four students, was the faculty advisor for the Society of Physic Students and the Wesley Foundation, and has participated in K-12 outreach.  She has authored or co-authored twelve publications—five of them peer reviewed. (*Id*. at 29–30).  Since 2016, Dr. Nayak has had funded grants of $299,876, at least two other grants awarded, and one pending proposal for $125,000. (*Id*. at 30).  Dr. Nayak's base ten-month pay was $55,080. Supplemented with summer work, a National Science foundation grant, and a course overload, her total pay in 2019 was $76,080. (*Id*. at 26).

- Assistant professor Moses Ntam is forty-two and was born in Cameroon. (*Id*.).  Dr. Ntam has authored or co-authored at least seven publications. (*Id*. at 31).  He has chaired three university committees and was a member of another, participated in community outreach to a local high school, and helped craft the department's COVID-19 response. (*Id*.).  He has pending grants for $1,000,000. (*Id*.).  Dr. Ntam's base ten-month pay in 2019 was $52,530.  Between summer, overload, and faculty peer mentor pay, Dr. Ntam's total pay was $70,239.97. (*Id*. at 26).

With the track record of the other members of the physics faculty in mind, the Defendant argues that the Plaintiff's contributions to the department fell short, and he was paid accordingly.  Although acknowledging that the Plaintiff was a good teacher, the Defendant shows that his contributions in scholarship, grants, and service were

18

significantly lower than those of his colleagues.  During his forty years at Tuskegee, the Plaintiff only published two articles and a textbook—in 1984 and 1988 respectively. (*Id*. at 42).  The Plaintiff testified that he declined the department chairmanship when offered, has not chaired a committee or advised students in ten years, and has never attended a faculty retreat. (*Id*.).  The Plaintiff's base ten-month salary at the end of his time at Tuskegee was $61,700—the third highest base pay in department.  Because the Plaintiff did not take advantage of summer, overload, or other pay opportunities, his total pay remained $61,700.  The Defendant reminds the Court that the Plaintiff testified that he was never denied the opportunity to teach in the summer. (Doc. 42 at 2); (*see also* doc. 34-1 at 16).

As support for his age discrimination claim, the Plaintiff points to the omission of "age" in several parts of the Faculty Handbook as evidence of discrimination.  However, this argument ignores the fact that "age" is listed as a protected characteristic elsewhere in the handbook, even within that same offending paragraph.  Further, the Defendant explains that the omission was a typo, pointing to the fact that "age" is included in a different sentence, in the same paragraph, on the same page. (Doc. 42 at 14–15).  Notably, the Faculty Handbook includes references to "age" throughout as a protected trait.

Finally, the Defendant argues that the University did not discriminate against the Plaintiff in denying his 2017 request for leave to finish his textbook. (Doc. 33 at 42–45).  The Defendant argues the leave request was denied, not on the basis of the Plaintiff's age,

but because the University does not favor the pedagogic[5] nature of the Plaintiff's textbook research. The Plaintiff concedes that he knew that pedagogic research was of little value to the University.

The Defendant has provided evidence of a legitimate nondiscriminatory reason for the Plaintiff's lower pay.  Because of this, the Defendant has satisfied its burden of production, and the burden shifts back to the Plaintiff.

### 3. *The Plaintiff does not show that the Defendant's reasons for employment actions are pretextual.*

To survive summary judgment, the Plaintiff must show that the Defendant's proffered nondiscriminatory reason for disparate treatment is pretextual. Black's Law Dictionary defines pretext as "[a] false or weak reason or motive advanced to hide the actual or strong reason or motive." *Pretext*, BLACK'S LAW DICTIONARY (11th ed. 2019).  A plaintiff successfully shows pretext either "by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256.  A court determines whether the plaintiff has established pretext by considering "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them

---

[5] Both the Plaintiff and the Defendant describe the Plaintiff's developing a new textbook as both "pedagogic" and "pedagogical."  As a technical matter, "pedagogic research" is "research that enhances the theoretical and/or conceptual understanding of teaching and learning processes, experiences, outcomes and contexts in higher education." *Pedagogic Research*, ANGLIA RUSKIN UNIVERSITY, https://aru.ac.uk/anglia-learning-and-teaching/good-teaching-practice-and-innovation/pedagogic-research.   Because the Parties describe the Plaintiff's research for his textbook as pedagogic, the Court will use pedagogic to describe the Plaintiff's research for his textbook.

unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005). Because the burden of persuasion always lies with the Plaintiff, he must show that Tuskegee's stated reasons are false or hide an actual discriminatory reason for disparate treatment.

To show that the Plaintiff's nondiscriminatory reasons are indeed pretext, the Plaintiff argues that his accomplishments in each of the University's pay factors are comparable to those of his younger peers. He explains the Defendant's "misguided contention simply ignores the many great accomplishments Dr. Burns has done, and continues to do, for Tuskegee University." (Doc. 41 at 33).

With the University's merit factors of teaching, grants, scholarship, and service in mind, the Plaintiff argues that his contribution in all those fields are comparable to other members of the department. The Plaintiff alleges that he was awarded teacher of the year in the late 1970s and 1989, received "the highest student" evaluations, and was recognized as one of the top five professors on campus. He adds that even Dean Prakash testified that many students liked the Plaintiff. (Doc. 41 at 32). The Plaintiff argues that the Defendant is wrong that he has not been active in grant procurement, scholarship, or service in the last ten years; however, he provides no evidence that he has been involved in any of these activities in the last ten years. (*Id*. at 34–35).

All the contributions the Plaintiff points to support pretext either happened decades ago or simply do not compare to those of his colleagues. For grant procurement, the Plaintiff cites to a $10,000 Wright-Patterson Airforce Base grant from 1979 and an unsuccessful multidisciplinary grant proposal worth $1,000,000 from the early 1980s. (*Id*.

at 33, 35).   For service, the Plaintiff argues that, although he has not chaired any committees, he has served on at least one committee in the last ten years. (*Id.* at 35).   He also notes that he was offered the chairmanship of the department, but he turned it down because he thought committee meetings were a waste of time. (*Id.*).   For research, the Plaintiff directs the Court to two articles published in 1984 and a textbook published in 1988, which was recorded verbatim on video in 2012. (*Id.* at 2, 33).   And he alleges he has completed two of eight to ten chapters of a new textbook. (*Id.* at 21).   The Plaintiff also argues that Tuskegee's emphasis on basic rather than pedagogic research is tantamount to age discrimination. (*Id.* at 47).   The Plaintiff argues that all these reasons show the Defendant's nondiscriminatory reasons are pretextual.

Despite the Plaintiff's protestations, he fails to show that the Defendant's stated reasons are pretext for age discrimination.   The Plaintiff argues generally that "there is really no effective way to compare the accomplishments of Dr. Burns with others." (*Id*. at 40).   But because merit raises cannot be provided to all faculty, (doc. 33 at 10), Tuskegee must necessarily compare the accomplishments of its professors to allocate limited funds.   Far from an "anything goes or carte blanche policy," (doc. 41 at 38), Tuskegee has shown that it uses objective criteria for determining merit raises, and that the Plaintiff's performance was wanting.   The evidence shows that the Plaintiff has not published or been awarded a grant since the 1980s or chaired a committee or advised students in ten years.   Although no one disputes the Plaintiff's success and contributions in the classroom, there is no evidence that this factor alone warrants pay comparable to his colleagues.   The

Plaintiff's lack of research, grants, and service to the University stand in stark contrast to the contributions of the other members of the department over the last ten years.

While the Plaintiff clearly disagrees with the Defendant's assessments of his contributions, he must show more than a disagreement with the reasoning provided by his employer. He must meet the Defendant's nondiscriminatory reason head on, rebut it, and not just quarrel with the wisdom of that reason. *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000). Here, the Plaintiff fails to do more than offer disagreement with Tuskegee's employment decisions. The Plaintiff has been quarrelling about his pay since the 1980s, and before recently, he petitioned the administration for pay raises for himself and the other members of the department. (Doc. 41 at 36–37; Doc. 42 at 9–1). He makes clear that he is quarreling with the underlying wisdom of Defendant's pay decision because he relies on the same facts as the Defendant to argue that he should be paid more. The Plaintiff explains, "one must shake his or her head and wonder why Dr. Burns has been so under appreciated." (Doc. 41 at 39). But Tuskegee told the Plaintiff why his contributions did not merit increased pay. In early 2008 and again in 2013, the University warned the Plaintiff of his unsatisfactory contributions in research, grants, and service. (Docs. 34-12 at 34; 34-12 at 38–42).[6] In his deposition, the Plaintiff recognized that the "name of the game" to receive raises was for faculty to pursue basic research and grants because they brought in money to the University. (*Id*. at 9, 39). Nevertheless, the Plaintiff has not

---

[6] In his affidavit, the Plaintiff does not deny he received a performance warning in 2008. (Doc. 41-3 at 10). He does say that he did not recall seeing the faculty evaluation from 2013 where he received deficient performance ratings in three of four categories. (*Id.*). However, he signed his name to the bottom of the evaluation below the line stating, "I certify that I have reviewed this evaluation and my Department Head's comments." (Doc. 34-12 at 42).

engaged in basic research or written grant proposals since the 1980s.  He also argues that Dr. Sharma, a longtime department head, is not a proper comparator because he had "more responsibility, deserves higher pay." (Doc. 41 at 38).   However, when offered the opportunity to be department head, the Plaintiff turned it down because he thought committee meetings were a waste of time. (*Id.* at 35).  Even though Plaintiff testified that he knew pay raises were tied to grants and new research and recognized "more responsibility, deserves higher pay," he continued not to pursue these activities and yet insists on more pay.

The Plaintiff also argues that the denial of his leave request in 2016 to finish a textbook for thermodynamics was discriminatory. (*Id.* at 8); (doc. 1 at 4–5).  He provides no evidence to support this contention.  He explains, "there have been insinuations, even statements, made about Dr. Burn's emphasis on pedagogical research . . . as if that somehow has less value." (Doc. 41 at 47).  But the Plaintiff testified that he knew pedagogic research was less valuable to Tuskegee.  In his deposition, he explained, the administration "appreciates only basic research where you bring in grant money," and "[t]hey do not support nor appreciate pedagogic research." (Doc. 34-1 at 38–39).  He also noted he didn't "know of anyone else that ever does pedagogic research other than myself." (*Id.* at 39). And the reason the University does not favor pedagogic research, the Plaintiff explained, is because only the author and not the university benefits. (*Id.*).  Plaintiff's 2016 request for leave to pursue pedagogic research was denied and not for the first time.  When the Plaintiff requested leave for a quarter semester in 1984 to finish his first textbook, the University also denied his request. (Doc 34-1 at 21–22). Because he provides no evidence

to show that his denial of leave was discriminatory and even demonstrates an understanding of the University's research priorities, the Plaintiff fails to show the University's reason for denying his request was pretextual.

Although the Plaintiff asserts that the pay disparities "hit you in the face," (doc. 41 at 10), he provides no evidence to show that Defendant's reasons were pretextual or that his pay was a function of his age. He explained that his credentials are like "apples and oranges" compared to his colleagues. (*Id.* at 39). And Tuskegee seems to agree. Considering in the last ten years the Plaintiff did not publish research articles, seek grants, advise students, chair committees, attend campus-wide retreats, address performance deficiencies, or teach summer classes, his contributions were below those of his colleagues. So Tuskegee paid him accordingly. The Plaintiff makes clear that he disagrees with this decision, but his opinion does not give rise to an age discrimination claim. Because the Plaintiff has failed to show that the Defendant's explanations were pretext, and, thus, that age was the "but for" cause of his alleged discrimination, his ADEA claim fails and is due to be dismissed.

## C.  The Plaintiff's Title VII and § 1981

In addition to his age claim, the Plaintiff alleges that Tuskegee discriminated against him because of his race and nation of origin. The Plaintiff brings claims of race and nation of origin discrimination under Title VII, (doc. 1 at 7), and under § 1981, (doc. 1 at 8).[7]

---

[7] A discrimination claim may be brough by a white person under § 1981. *McDonald v. Santa Fe Trail Transportation Co*., 427 U.S. 273, (1976). However, § 1981 does not extend to discrimination claims based "solely" on the place or nation . . . of origin." *Saint Francis College v. Al–Khazraji*, 481 U.S. 604, 613 (1987). Nevertheless, "[i]n some contexts, 'national origin' discrimination is so closely related to racial

The Plaintiff points to no direct evidence of race or nation of origin discrimination, so this Court must rely on circumstantial evidence. Because the *McDonald Douglas* framework is used for Title VII and § 1981, and the Plaintiff's race and nation of origin claims are intertwined, the Court will consider both claims together. *See Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1217 (11th Cir. 2019). When proceeding under *McDonnell Douglas* for Title VII or § 1981, a plaintiff bears the initial burden of "establishing a *prima facie* case of discrimination by showing (1) that [he] belongs to a protected class, (2) that [he] was subjected to an adverse employment action, (3) that [he] was qualified to perform the job in question, and (4) that [his] employer treated "similarly situated" employees outside [his] class more favorably." *Id*. at 1220–21.

In accordance with *McDonald Douglas* standard, the Plaintiff makes out a *prima facie* case for national origin and racial discrimination. He has pled that he is a member of protected group as the only white and American-born member of the Physics Department; he is qualified for his job; he did not receive requested raises or leaves; and other non-white and non-American-born members of the department did receive such benefits. He argues that the racial and national origin composition of the Tuskegee Physics Department is demonstrative of racial bias against American-born whites. (Doc. 1 at 4; doc 41 at 6–7).

---

discrimination as to be indistinguishable." *Bullard v. OMI Georgia, Inc*., 640 F.2d 632, 634 (5th Cir. 1981); *see also Alvarado v. El Paso Indep. Sch. Dist.,* 445 F.2d 1011 (5th Cir.1971) (holding that a complaint by Mexican Americans alleging racial and ethnic discrimination clearly stated a cause of action under § 1981). Although it is unlikely that the Plaintiff can show that his race discrimination claim is so closely related to his nation of origin discrimination claim as to be indistinguishable, the Plaintiff may still proceed on his § 1981 claim on the basis of race discrimination.

As the Defendant recognizes, the Plaintiff successfully makes out a *prima facie* case for race and nation of origin discrimination. (Doc. 33 at 47).

With the burden of production shifting to the Defendant to show a legitimate nondiscriminatory explanation for its actions, the Defendant argues the Plaintiff's race and nation of origin claims fail for the same reason his ADEA claim fails.  Namely, the University distributes merit raises based on four legitimate nondiscriminatory factors—scholarship, teaching, grants, and service.  Because the Plaintiff had a track record of being deficient in three out of the four factors, the University gave raises to other members of the faculty department who had more substantial contributions than the Plaintiff. (Doc. 33 at 47).  Further, the University denied his leave request to write his textbook because it does not encourage pedagogic research—a policy known to the Plaintiff.  Because the Defendant proffered legitimate nondiscriminatory reasons for its pay and leave decisions, the burden now shifts to the Plaintiff to show that the Defendant's proffered reasons are pretextual.

The Plaintiff points to no facts in his response to refute the Defendant's legitimate nondiscriminatory reasons.[8]  Without any supporting evidence, the Plaintiff alleges that "certain nationalities become entrenched and start attracting others.  That same nationality, like a click [sic], keeeps [sic] growing larger." (Doc. 41 at 12).  He argues that this explains

---

[8] The Plaintiff testified in his disposition about several statements that he describes as racist by former Tuskegee president Benjamin Payton.  Although he could not remember the exact words, the Plaintiff testified Payton spoke about "whites suppressing blacks" and was "very angry about systemic racism." (Doc. 34-1 at 54).  He also testified that these statements occurred six to eight years ago. (*Id*.).  The Plaintiff cites to these statements in his affidavit responding to the Defendant's statement of facts and argues that these comments were indicative of racial bias within the "ranks of top administrators" at Tuskegee. (Doc. 32-1 at 14).  The Court concludes that these statements have little evidentiary value because there is no evidence that President Payton had a role in setting the Plaintiff's salary or other employment decisions of which the Plaintiff complains.  Further, the temporal proximity of these comments is too attenuated.

"why, and how, all Indians were so well paid, all much better so than Dr. Burns, reflecting national origin discrimination." (*Id*.).   Conclusory allegations of discrimination, without any supporting evidence, are insufficient to support a claim for race and nation of origin discrimination or to show that the Defendant's reasons are pretextual.   Like his age discrimination claim, the Plaintiff fails to show that the Defendant's nondiscriminatory reasons for its employment decisions are false or pretext for discrimination.

## VI. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Defendant's Motion for Summary Judgment, (doc. 32), is GRANTED.

2. The Defendant's motions to strike Plaintiff's expert witness report, (doc. 25), *Daubert* motion, (doc. 35),  the Plaintiff's motion to supplement the Plaintiff's response in opposition to strike expert, (doc. 36), and the Parties' joint motion to stay, (doc. 51), are DENIED as moot.

3.  Final judgment will be entered in favor of the Defendant and against the Plaintiff. Done this 17th day of March, 2021.


/s/ Emily C. Marks
EMILY C. MARKS
CHIEF UNITED STATES DISTRICT JUDGE